Fuld, J. (dissenting).
I cannot accept the court’s thesis that the corporation’s sale of the leasehold, the only property it ever owned or, as far as the record discloses, ever intended to own, was made, within the sense of section 20 of the Stock Corporation Law, “ in the regular course of [the corporation’s] business ”, and, in reaching that conclusion, I place no reliance (as the majority apparently does) upon any alleged ultra vires acts performed by, or attributed to, the corporation. As I see the case before us, the question presented, briefly stated, is this: Does section 20 cover a so-called real estate corporation which, although organized to buy, sell and deal in real estate generally, has engaged only in the business of operating and managing the single piece of property which it sold?
Senior Estate, Ltd., was organized in 1947 — according to the record, for “ tax saving ” purposes — as an “ affiliate ” of the John Post Construction Corporation and was chartered to engage “ in the business of buying, owning, selling, leasing and generally trading and dealing in lands, buildings and structures ”, The company apparently did nothing until March, 1953, when it acquired a sublease of certain theatre premises, located in Greenwich Village, New York City. A year later, in 1954, Eisen purchased 50% of the corporation’s stock from its two stockholders, John Post and his sister Anita Post *527 Litsky. The corporation never acquired or sought to acquire any other property, the only business it ever did was to hold and operate the leasehold and the only assets it ever had were the leasehold and its appurtenances. In 1955, it sold that leasehold and those appurtenances to defendant Schweitzer for $37,500, pursuant to a plan that such proceeds be distributed among the stockholders in proportion to their respective holdings.
Bisen refused to accept his one-half share of the sales price, urging that, by reason of section 20 of the Stock Corporation Law, the company could not sell all of its assets without at least obtaining the consent of two thirds of its stockholders, and this suit followed to invalidate the sale. The trial court decided that section 20 was not applicable and that, in any. event, even if it were, plaintiff, by reason of his misleading conduct, was prevented from urging that it should have been complied with. The Appellate Division, in unanimously reversing, indicated its disagreement on both scores.
Section 20, designed to protect minority stockholders, after authorizing a corporation to sell, lease or exchange its property and assets, goes on to provide that, “ if such sale, lease or exchange is not made in the regular course of business of the corporation and involves all or substantially all of its property * * ® such sale, lease or exchange shall not be made without the consent ” of either all of its stockholders “ given in writing without a meeting ’ ’ or two thirds of the stockholders “ at a meeting * * ® called pursuant to section forty-five.” It is conceded that Senior sold “ all or substantially all ” of its property. However, the court is taking the position that, since its charter empowered the corporation to engage in the business of buying and selling real estate, any sale of realty which it makes must be deemed “ in the regular course of business ”. This, in effect, is a holding that the corporation’s regular course of business must be determined solely by an examination of the words found in the certificate, without considering the activity upon which the company is actually engaged.
In my opinion, as the cases seem plainly to hold, that cannot be. (See Matter of Kunin [Title Guar. & Trust Co.], 306 N. Y. 967; Matter of Hodes [1299 Realty Corp.], 278 App. Div. 803; Matter of Borea [Locust Ct. Apts.], 234 App. Div. 450; Star *528 rett Corp. v. Fifth Ave. & 29th St. Corp., 1 F. Supp. 868, 871; see, also, Matter of Hurd [Broadway & 58th St. Corp.], 5 Misc 2d 443.) In the Kunin case, for instance, this court held that, in determining whether a particular transaction was to be regarded as one in the regular course of a corporation’s business, we must examine not only the corporate charter, but also the character of the assets disposed of and the resultant changes in the nature of the corporate business. And, indeed, in the Hades case [supra, 278 App. Div. 803), the very question now before us was decided. The charter authorized the corporation there involved to buy, sell, rent and deal in real estate. The court, however, concluding that that recital was not controlling, held that the sale of an apartment house, which had been the company’s sole asset for some years, could not be deemed one in the regular course of business under sections 20 and 21 of the Stock Corporation Law.
A corporation empowered to buy, sell and generally trade in real estate may not be said to be carrying on that “ business ” if its entire corporate life has been devoted to owning, managing and operating but a single piece of property. There is, it seems almost self-evident, a great difference between a company which owns, or has owned, a number of lots or buildings and is, or has been, engaged in turning them over — that is, buying, selling and buying again — and a company which acquires but one piece of property, as an investment and not for resale, derives all of its income from it and spends all of its time and energies upon its operation and management. The “ business ” of a corporation, its “ regular course of business ”, just as that of a partnership or an individual, is the business upon which it is actually engaged, not the business which it was originally authorized to carry on.
It is significant that the statute refers, not to what the corporation’s charter empowers it to do, but to its “ regular course of business ”. And, of equal importance, stockholders make investments in a particular corporation on the basis of the business which the corporation is actually conducting, not the business it may be authorized to pursue — and the purpose of provisions such as those found in section 20 is to prevent the nature of that investment from being changed, to protect minority stockholders from being forced into a business differ *529 ent from the one in which they had invested. (See Matter of Kunin [Title Guar. & Trust Co.], supra, 306 N. Y. 967.)
Having in mind that that is the purpose underlying section 20, let us examine the situation here presented. Before the sale, Bisen, a 50% stockholder, had an investment in a corporation engaged, during its entire existence, in owning and operating a particular leasehold and earning a steady income. After the sale, all that he had was a liquidating dividend derived from the purchase price, a far cry from what he had invested in. In point of fact, once Senior Estate sold the only piece of property it ever owned, the asset upon which the enterprise depended, and then proceeded to distribute the moneys realized on the sale among the stockholders, it was, for all practical purposes, out of business, even though it still possessed a charter. It is difficult to understand how a sale effectively terminating the corporation’s “ business ” may be regarded as one made in its regular course, no matter how extensive the recitals of its charter.
Experience has taught that the certificate of incorporation is an unreal and uncertain, if not an impossible, determinant of the business actually conducted. None will dispute that charters ordinarily define the corporate purposes and powers in the broadest of terms to avoid any question of ultra vires. That being so, a corporation, though formed to engage in one business, may emerge as an operator of a quite different business which, however, because of the breadth of its charter terms, it is authorized to conduct. In such a case, if we are to ascertain what the company’s course of business really is, we must look beyond the charter.
Moreover, if we consider the charter alone, then, section 20 applies, if at all, only in the rarest case, and the manifest purpose of the statute — to protect minority stockholders (Matter of Timmis, 200 N. Y. 177, 181)—is plainly thwarted. In fact, if we examine only the charter, no transaction would fall within the protection afforded by section 20 unless it were outside the corporate purposes and beyond the corporate powers, in other words, unless it were ultra vires. Quite obviously, that is not the design of the statute, and it cannot be the law. Section 20 was not aimed at the ultra vires; it deals, as its wording renders plain, not with ultra vires transactions, *530 but with sales “ not made in the regular course of business The thought behind the statute is that certain transactions may not be in the regular course of its business, even though within its corporate purposes and powers.
These considerations point up the necessity of looking beyond the charter to determine the regular course of a company’s business and that necessity exists just as much in the case of a so-called real estate corporation as any other. It may be true, as urged, that a title company has a more difficult task if it must examine more than the corporate vendor’s charter to determine whether a sale of real property was valid. But, surely, the court may not read into section 20 an exception not even suggested by the legislature and, certainly, it should not defeat the purpose of the statute and jettison the rights of minority stockholders in order to facilitate the work of title companies. As a matter of fact, the fears expressed on behalf of the title companies seem somewhat less than real. The view that section 20 required stockholder consent to a sale of a building by a corporation organized to buy, sell and deal in real estate is not new or novel; it was actually announced as the law of this state by the Appellate Division in 1951 (see Matter of Hodes [1299 Realty Corp.], supra, 278 App. Div. 803) and by a federal court in 1932 (see Starrett Corp. v. Fifth Ave. & 29th St. Corp., supra, 1 F. Supp. 868, 871). It is not to be supposed that the title companies failed to adapt their practice to the law thus expressed years ago, and it is not at all unreasonable to say that in so doing they encountered no insuperable obstacle.
My conclusion that section 20 applies to the sale under consideration provokes the further question — which the court does not reach — as to whether the plaintiff before us may insist on compliance with its provisions. Both courts below found that the plaintiff had orally consented to the sale and that the defendants had relied upon such acquiescence in consummating the transaction. The trial court, on the basis of these facts, intimated that the plaintiff was in no position to complain about the corporation’s failure to comply with section 20. The Appellate Division, however, reached a different conclusion; it was that court’s view that, since the statute was so explicit in its insistence upon either the consent of all stockholders given in writing without a meeting or the consent of *531 two thirds of the stockholders obtained at a meeting called pursuant to section 45, testimony of an asserted oral consent given by the plaintiff could not be relied upon as a substitute. The question thus posed is not free from doubt (compare Starrett Corp. v. Fifth Ave. & 29th St. Corp., supra, 1 F. Supp. 868, 874, requiring strict compliance with statute, with Matter of J. A. M. A. Realty Corp., 92 F. 2d 3, 5-6; Matter of Victoria Fusilli Co., 79 F. 2d 611, 612-613, not requiring strict compliance with statute) and, since the majority has not considered the problem, I do no more than remark it. Accordingly, I merely record my disagreement with the court’s holding that section 20 did not cover the sale here under attack.
Judges Desmond, Dye, Froessel and Burke concur with Chief Judge Conway ; Judge Fuld dissents in an opinion on question as to applicability of section 20 of the Stock Corporation Law in which Judge Van Voorhis concurs.
Order reversed, etc.